UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 5:17-CR-69-DCR-REW |
| | ) | |
| v. | ) | |
| | ) | RECOMMENDED DISPOSITION |
| GERARDO A. MEJIA-PALACIO and | ) | |
| HECTOR SALAS, JR., | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*    \*\*\*    \*\*\*    \*\*\*

The Court addresses motions to suppress filed by Defendants Salas and Mejia-Palacio. DE ##18, 20 (Motions). Defendants stand indicted for aggravated cocaine and heroin trafficking, DE #24 (Superseding Indictment), and face a particular count of aggravated possession with intent to distribute cocaine based on alleged May 18, 2017, conduct. *Id.* at 2 (Count 3). The motions address a traffic stop and warrant on that date, and the United States filed a consolidated response. DE #30 (Response). The similar arguments and common factual field logically prompted a joint evidentiary hearing. DE #40 (Minute Entry Order).

Having considered the testimony, the state warrant materials, and the full federal record, the Court **RECOMMENDS DENIAL** of the motions (DE ##18, 20). The stop was sound under multiple analyses, as was the resultant valid dog sniff and subsequent state warrant. There is no basis for suppression as to the May 18, 2017, events.

## I.      BACKGROUND

### A.      Arguments and Hearing

The pre-hearing briefs focused on the facts of the May 18, 2017, traffic stop of Defendants on Versailles Road in Lexington. The Lexington Police Department (LPD) stopped Defendants, who operated a Jeep, which pulled a trailer eventually found to conceal six kilograms of cocaine in the axle. Counsel contested both the bases for the stop and raised stop elongation as an issue, under *Rodriguez v. United States*, 135 S. Ct. 1609 (2015). The sequence of argument would undercut the propriety of a crucial dog sniff and thus excise sniff results from a state warrant that ultimately led to the full and fruitful trailer search.

The Court heard testimony[1] from FBI Special Agent Michael Van Aelstyn (the case agent), [R. at 1:32:35–2:06:10 and 3:56:43–58:36], FBI SA David Lowery (a stop witness), [R. at 2:06:47–15:45], LPD Officer Kevin Duane (the officer conducting the stop), [R. at 2:16:43–3:15:35], Kentucky State Police (KSP) Trooper Kenneth Leavell (the KSP K-9 officer), [R. at 3:17:45–42:49], and KSP Det. Hector Alcala (the warrant affiant), [R. at 4:01:09–10:36]. The Court also received and has reviewed several exhibits pertinent to the case, to include the K-9 certificate, the warrant papers, and the citation resulting from the stop. DE ##30, 38.

The Government clearly established[2] 1) a valid stop based on a probable civil traffic violation; 2) alternatively, a valid investigatory stop related to suspected drug trafficking;

---

[1] The Court notes the digital recording in the record at DE #40. The clarity of the hearing record dissuaded the Court from ordering transcription prior to issuing this decision. The decision references the digital record by time stamp, *e.g.*, [R. at 0:00:00–9:99:99.]

[2] The United States had the burden as to the key issues—stop propriety, K-9 qualifications, any warrantless vehicle entry. *See Katz v. United States*, 88 S. Ct. 507, 514–15 (1967) (holding warrantless searches "per se unreasonable under the Fourth

3) no improper elongation under *either* stop theory; 4) a valid dog sniff; and 5) probable cause supporting the trailer search, as captured and reflected in the legitimate state warrant. There simply is no infirmity in the efforts of police regarding this search and consequently no suppression basis.

### B.    The Stop and Search Events

The hearing witnesses told a consistent and unopposed story[3] regarding the stop and search events. Based on the record, the Court finds the following:

The stop was not the result of incidental patrol. The FBI had been working with a known CI, a person SA Van Aelstyn considered reliable and truthful based on previous interactions.[4] [R. at 1:33:00–35:00.] The CI alerted the FBI on or about May 18 that a large narcotics load was expected to arrive soon in Lexington. *Id.* Later that day, the CI, who had been in contact with a Hispanic male, confirmed load arrival. Eventually, the CI met or had direct contact with the suspected delivery vehicle at the Aguascalientes Super Mercado on Versailles Road. The CI informed the FBI that the vehicle was a gold Jeep Cherokee pulling a trailer. [R. at 1:37:00–38:30.] Authorities had confirmed the CI's phone contact with a Hispanic male and then also confirmed the matching vehicle at the described location. *Id.* The FBI noted the trailer as nearly identical to that used in the prior delivery,

Amendment—subject only to a few specifically established and well-delineated exceptions."); *United States v. Haynes*, 301 F.3d 669, 677 (6th Cir. 2002) ("The Government has the burden of proof to justify a warrantless search.").

[3] Counsel had some criticisms of Officer Duane for not having an operational body camera. Duane explained that he was new to the technology and that his unit on that day had malfunctioned by mischarging (and was, in fact, replaced). [R. at 2:39:00–42:00.] There was no evidence of ill intent. The entire events occurred on a busy street and in a public parking lot in broad daylight and in the full view of a multi-agency team. There is no reason to view the camera issue as anything other than a technical glitch.

[4] This included CI involvement relative to a prior narcotics delivery involving a trailer, which the FBI had observed at a Lexington address, the same address associated with the delivery at issue. [R. at 2:03:00–3:30.]

which involved significant quantities of narcotics hidden in the trailer body. [R. at 2:04:30–5:00.]

Police observed the vehicle exit the lot and turn onto Versailles Road, headed in the direction of the suspected destination. The FBI tailed but did not stop the vehicle. Rather, Lexington Officer Duane and KSP Trooper Leavell parked together beside Versailles Road some distance from the Super Mercado. The vehicle passed and the officers entered the road. In the period before the stop, multiple officers observed that the towed trailer had no operational brake lights. [R. at 2:11:40–12:10; 2:20:20–20:35.] At least two officers, including Duane, saw the vehicle abruptly (and without signal) change lanes in front of other traffic. [R. at 2:12:10–25; 2:19:30–20:20.] Duane activated his lights and pulled the vehicle over in a commercial lot (the O'Reilly Auto Parts store) on Versailles Road. Trooper Leavell pulled in behind Duane and the stopped Jeep within 90 seconds.

Officer Duane approached the vehicle to secure license and registration. He obtained the IDs of both occupants, driver Gerardo Mejia-Palacio and passenger Hector Salas. The vehicle had a Tennessee registration and Mejia-Palacio an Arizona license (though with the novelty of a listed residential address in Tennessee). [R. at 2:22:30–23:00.] Salas had a California identification card. In a 2–3 minute exchange, Duane learned that the pair purported to be in Lexington to do "drywall work" on their "Aunt's house." [R. at 2:24:05–25:00.] Neither occupant had an address for the aunt and only knew she lived "downtown." *Id.* The Jeep contained no hand tools for drywall work (indeed, no tools of any type), and the trailer carried only a large compressor laid on its side.

Duane then spent 5–7 minutes in his car checking the registration and running the IDs for "wants and warrants." [R. at 2:59:00–3:01:15.] This is SOP for Duane. *Id.* He

noticed the Tennessee address oddity for Mejia-Palacio and found a non-extraditable California weapons warrant for Salas. Duane then returned to the Jeep and had the occupants exit so that Trooper Leavell could have his dog sniff the exterior of the Jeep and trailer. He testified this took about 1 minute and that the dog quickly alerted for narcotics. Mejia-Palacio then, when questioned, revealed "personal use" drugs in the passenger area, which police quickly found in three places and in varying small quantities. Authorities effected arrest of both. In sum, Duane put the dog alert at 12–14 minutes after the stop; this squared with SA Van Aelstyn's second-hand timeline, which put the stop at 13:34 and the dog alert at 13:48.[5]  [R. at 2:53:25–54:00]

Leavell confirmed most of Duane's account. Leavell was on the scene immediately, merely awaiting Duane's indication to present the vehicle to his dog, Bako.  The Trooper believed he ran Bako around the vehicle within 5–7 minutes of the stop, a quicker sniff than Duane reported. [R. at 3:25:30–25:45.] Per standard protocol before a sweep, Duane had removed the occupants. Bako alerted both to the driver's side door seam and, aggressively, to the underside of the trailer. Per Leavell, Bako literally was trying to crawl under the trailer at the axle area. [R. at 3:26:00–28:00.] He deemed each alert by Bako to positively signal the current or recent presence of narcotics.[6] The Court adopts Duane's

---

[5] The citation, listed in the record at DE #40, further supports this. That document records the *arrest* time as 13:50; the sniff immediately preceded the Jeep search, which immediately preceded the arrest. This leads the Court to believe the sniff must have occurred some minutes (the time needed to search and find the cocaine) before 13:50.

[6] The defense did not contest Bako's certification in post-testimony argument. Trooper Leavell and Bako have three certifications—the original one at Bako's graduation (issued by the Southern Ohio Police Institute) and internal KSP certifications from 2015 and 2016. [R. at 3:39:30–40:30; 3:42:00–42:30.]  Leavell confirmed that all certifications resulted from controlled testing by a neutral evaluator and that he and Bako were blind to hides, contraband placements, etc., in the testing protocols. [R. at 3:41:15–3:42:00.] Bako has remained certified throughout and has never been suspended based on false-positives or performance deficits. [R. at 3:42:30–43:00.]  His current certification is in the record.

timeline—he was the originator and master of the stop, and the recorded time markers best support the described interval of 12–14 minutes between stop initiation and Bako's alert.

After the alert, police searched the full vehicle—this included a hard and thorough look at the Jeep, the compressor, and the trailer itself. The fortuity of the stop location gave police access to some tools loaned from O'Reilly's, which Duane and others used in the search. Ultimately, the on-site search yielded nothing beyond the personal use quantities. Knowing the vehicle would be moved, and expecting a need to cut into the trailer[7], authorities decided to secure a state warrant. [R. at 4:07:15–7:30.] Det. Alcala was the affiant; Judge Bouvier signed the warrant. DE #30-2 (State Search Warrant). Police eventually drilled into the axle and found white powder. The axle surrendered six kilos of cocaine.

## II.    DISCUSSION

### A.  The Stop Was Valid on Two Bases

The stop was part of a broader drug investigation by the FBI.  Both the particulars of the investigation, and the specifics of the scene, justified the May 18 stop of Mejia-Palacio and Salas.

As to the vehicular concerns, the Sixth Circuit requires that probable cause support the stop of a vehicle for a completed civil infraction. *United States v. Rios*, 830 F.3d 403,

---

DE #30-1. Seeing no contradiction, the Court finds Bako qualified under the standards of *Florida v. Harris*. 133 S. Ct. 1050, 1057 (2013) ("If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.").

[7] A reasonable expectation based on the status and the prior delivery to Shropshire (also the suspected destination on May 18), which involved suspects using a grinder to remove drugs from the axle of a trailer. *See* DE #1-1 (McIver Affidavit) at 3–4.

429 (6th Cir. 2016) ("In order to effect a traffic stop, an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity.") (quoting *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012)). Duane and others saw the vehicle operate without functioning brake lights on the trailer and witnessed the Jeep abruptly change lanes without signaling. Either infraction (KRS §§ 189.380; 189.050-.055) would carry only a fine. *See* KRS §§ 189.990; 189.993. Certainly, and with no contradictory proof, the direct observations of Officer Duane, corroborated by other involved authorities, establish probable cause[8] for the regulatory violations. Duane appropriately effected the stop.[9]

The Court alternatively finds that Duane, in the circumstances, could have stopped the Jeep anyway, as a part of the drug investigation. *Terry* principles[10] extend to vehicle

---

[8] Probable cause means "more than mere suspicion" but not "evidence to establish a prima facie case . . . much less evidence sufficient to establish guilt beyond a reasonable doubt." *United States v. Strickland*, 144 F.3d 412, 416 (6th Cir. 1998). "'[T]he facts and circumstances within [the officers'] knowledge and of which [they] had reasonably trustworthy information [must be] sufficient to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *United States v. Hughes*, 606 F.3d 311, 320 (6th Cir. 2010) (quoting *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005)).

[9] That the stop was incidental to that larger drug investigation does not change the analysis. *Schneider v. Franklin Cnty.*, 288 F. App'x 247, 251 (6th Cir. 2008) ("Subjective intentions play no role in probable cause Fourth Amendment analysis.") (citing *Whren v. United States*, 116 S. Ct. 1769, 1773–74 (1996)).

[10] As summarized in *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011):

To justify a brief, investigative stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), an officer must point to specific, articulable facts that gave rise to a "reasonable suspicion" that the suspect was engaged in criminal activity. *Id.* at 21, 88 S.Ct. 1868. "A reasonable suspicion exists when, based on the totality of the circumstances, a police officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Baldwin*, 114 Fed. Appx. 675, 679 (6th Cir. 2004) (quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S. Ct. 690, 66 L.Ed.2d 621 (1981)). The officer "must be able to articulate something more than an inchoate and unparticularized

stops, and if law enforcement had reasonable suspicion of criminal activity, Duane had the right to stop the vehicle for further appropriate inquiry. *See United States v. Arvizu*, 122 S. Ct. 744, 750–51 (2002). The FBI knew a) the circumstances of the prior like delivery, which involved the CI; b) the FBI deemed the CI truthful and reliable; c) the CI had information of a large delivery; d) the CI confirmed load arrival, identified the vehicle, and had direct contact with the delivering actors; e) authorities confirmed the contact and the vehicle at the location indicated by the CI; f) the vehicle, including the occupants and the trailer involvement, matched the type of delivery previously encountered and was headed toward the suspected drop location. All of this, in combination, supported an investigative stop with or without the justificatory traffic-law breaches.

Once the stop occurred, Duane secured additional information strongly signaling further cause for suspicion and continuing scrutiny. The occupants had travelled a significant distance and came from drug source locations. (Tennessee is not far, of course, but Mejia-Palacio carried an Arizona license; Salas is a Californian.) The men purported to be in Kentucky for "drywall work" but carried only a large, prone compressor. They were there to work for their aunt, but most curiously, they had no address for her despite being minutes from downtown Lexington. Duane observed the rehearsed nature of the suspects' responses, and he was highly skeptical of the drywall tale.[11] In the totality,

---

suspicion or hunch." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L.Ed.2d 1 (1989) (citations and internal quotation marks omitted).

[11] The defense reasonably noted that the drywall tools could have been at the jobsite; the compressor could theoretically have been useful for framing or spray applications. All true enough. However, it was reasonable for Duane to think that legitimate workers would carry *some* tools. Even the manner of toting the compressor—on its side—was unusual and suspicious in Duane's experience. Duane's did not have to be the only view to be a reasonable one. The Court assesses the totality here, and the western duo, carrying

authorities had plentiful concrete and particularized information, well above the *Terry* bar, to stop the vehicle and continue the investigatory steps followed that day.

### B. Bako Timely Played His Part

The Court carefully assessed the particulars of the K-9 involvement. Under either stop analysis, Bako timely played his part.

The defense premised most of its arguments on whether police elongated the stop unnecessarily in violation of *Rodriguez* principles. A valid stop lasts only as long as its justified mission, and Defendants argue that Duane, to accommodate the K-9 involvement, dragged the stop out beyond the time reasonably needed to take care of the traffic infractions. *See Rodriguez*, 135 S. Ct. at 1616 (reiterating that stop "prolonged beyond" completion of stop mission is "unlawful" and noting "critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'—i.e., adds time to—'the stop.' ").

Looking (artificially) only at the vehicular justifications, the Court observes that Leavell was on-site almost immediately. He had been staged with Duane as the Jeep first passed. Leavell waited for Duane's signal to search, which happened after Duane verified information, accessed his computer, and police removed the occupants. Bako swept the vehicle no more than 12–14 minutes after the stop. Duane stated his typical stop duration, involving only a suspected traffic issue—from actual stop to termination post-ticket—is 15–20 mins. Although Duane handwrites citations, nothing indicates he is unreasonably slow in his manner or protocols. Further, Duane took entirely proper steps to verify information, checking the driver's credentials and the car for current registration and

---

neither tools nor an aunt's address, surely augmented the base of reasonable suspicion created by the CI's information and the other circumstances of the day.

querying any "wants or warrants." *See id*. at 1615 (listing as within traffic stop mission "ordinary inquiries" to include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance"). Duane spent less than 3 minutes with the occupants, then 5–7 minutes in his cruiser running the IDs. Nothing in the conduct or chronology indicates a measurable elongation of the stop to accommodate the K-9. Duane obviously would, on a typical stop chronology, have been writing a ticket during the period when Leavell swept the scene with Bako.

Further, and critically, the stop did not involve only the illegal brake lights and lane change. As the Court has recounted, the real focus of the day was the expected narcotics load. Given the reasonable suspicion of that, and the justified investigatory stop, any slight delay in activating Bako is of no moment. *United States v. Davis*, 430 F.3d 345, 354–55 (6th Cir. 2005) ("[T]he police had reasonable suspicion to detain Davis for the additional approximately thirty to forty-five minutes it took for the police to bring the first drug-sniffing dog to the scene and have the dog check the vehicle for the presence of narcotics."); *United States v. Zuniga*, 613 F. App'x 501, 505 (6th Cir. 2015) (affirming denial of dog-related motion to suppress when the "total length of the traffic stop was thirty minutes"). The elements of the stop, information gleaned from the occupants, and the backstory reasonably warranted a dog sniff; Leavell promptly performed that step, an act that occurred within 15 minutes of the stop. Again, this was reasonable and justified, independent of the regulatory issues. *United States v. Bah*, 794 F.3d 617, 629 (distinguishing *Rodriguez* because officers "had reasonable suspicion to continue [party's] detention" independent of traffic stop).

### C. The Warrant is Unassailable[12]

Finally, the Court deems the warrant unassailable.[13] The four corners show a valid and appropriate application tendered and sworn to by Det. Alcala. Judge Bouvier obviously scrutinized the document carefully—he required that Alcala supplement, on site, as to Bako's certification. The language of the application shows that Bako, holding valid credentials, alerted on the vehicle, showing "much interest on the trailer area." DE #30-2. Mejia-Palacio suggests the application does not show an actual alert on the trailer itself; the Court disagrees. Alcala, throughout the affidavit, uses the singular "vehicle" when addressing both the Jeep and trailer. *See id.* ("The vehicle was stopped[.]"); ("The only tools observed *in the vehicle* were that of a large air compressor on the back of the trailer.") (emphasis added); ("The canine conducted a free air sniff of the exterior of the vehicle and gave a positive indicator to the presence of narcotics."); ("The dog showed much interest on the *trailer area of the vehicle*.") (emphasis added). The affidavit verbiage and syntax

---

[12] The warrant was a likely unnecessary—though imminently reasonable—measure. The general rule under the Fourth Amendment is that "warrantless searches are presumptively unreasonable[.]" *Horton v. California*, 110 S. Ct. 2301, 2306 (1990). One of many exceptions to this general rule is the so-called automobile exception. *See California v. Carney*, 105 S. Ct. 2066, 2068–69 (1985). Under the automobile exception, "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." *Pennsylvania v. Labron*, 116 S. Ct. 2485, 2487 (1996) (per curiam). Bako's alert provided probable cause to search. *See supra* at n.6.

[13] The Court undertakes a deferential and totality review merely screening to ensure that Judge Bouvier had a substantial basis for warrant issuance. *See United States v. Leake*, 998 F.2d 1359, 1363 (6th Cir. 1993) ("In reviewing a state magistrate's determination of probable cause, this court pays great deference to a magistrate's findings, which should not be set aside unless arbitrarily exercised.") (internal citations omitted). Here, given the dog alert, probable cause plainly existed, and Judge Bouvier obviously had a substantial, non-arbitrary basis for his warrant.

treats the Jeep and trailer as an integrated vehicle[14], and the materials clearly show Bako's alert on the trailer. The alert by a certified dog establishes probable cause, fully supporting the warrant basis. *Harris*, 133 S. Ct. at 1057 ("If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.").

Part of the defense theory is to invalidate the sniff, which would remove a key piece of the warrant basis. Because the Court rejects that predicate, the argument fails. The sniff by Bako was proper. His alert to the Jeep and trailer provides probable cause, and the warrant application captures and relies on that cause. Since the application quite properly included the information, there is no basis for eliding the application and no basis for assailing the warrant.

## III.    CONCLUSION

Based on the analysis and findings stated, there is no basis for suppression in this case.[15] The Court thus **RECOMMENDS** that the District Judge wholly **DENY** Defendants' motions to suppress (DE ##18, 20).

---

[14] The trailer is a vehicle under Kentucky law. *See* KRS 189.010(19)(a) (defining vehicle to include "[a]ll agencies for the transportation of persons *or property* over or upon the public highways of the Commonwealth") (emphasis added).

[15] The Court need not reach good faith or the propriety of suppression as a remedy. *See United States v. Godfrey*, 427 F. App'x 409, 412–13 (6th Cir. 2011); *United States v. Master*, 614 F.3d 236, 241-43 (6th Cir. 2010). If it did, the Court would note the absence of any evidence of wrongful conduct by authorities in this matter. Judge Bouvier issued a valid warrant premised on a valid dog sniff, and police surely had the right to rely on same in effecting the plenary search. As the Court pondered at the hearing, the search likely would have been appropriate even without the warrant; the Court endorses the more conservative approach of letting a neutral judicial officer pass on the cause via the warrant process. *See United States v. Chadwick*, 97 S. Ct. 2476, 2482 (1977) (search warrant "provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime' ") (quoting *Johnson v. United States*, 68 S.Ct. 367, 369 (1948)).

\*    \*    \*    \*    \*

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of that statute. The parties should consult the aforementioned statute and Federal Rule of Criminal Procedure 59(b) for specific appeal mechanics. The objection period will be as stated in the Rule and statute, subject to any particular schedule set by Judge Reeves. Failure to object in accordance with the Rule waives a party's right to review.

This the 25th day of July, 2017.



**Signed By:**

**_Robert E. Wier_**

**United States Magistrate Judge**

---

The Court perceives utterly no argument for suppression under developed good faith exception standards in this Circuit. *See, e.g.*, *United States v. Brummett*, No. 5:13-135-DCR, 2014 WL 2118265, at \*6–\*8 (E.D. Ky. May 21, 2014) (explaining the standard, including the balancing test required). Salas, Jr., makes a conclusory attempt to characterize the affidavit as bare bones. DE #18-1 at 5. However, Defendant's argument requires a prior finding that information contained in the affidavit was unconstitutionally obtained. *See id.* As previously discussed, that argument is unavailing. Thus, although the Court finds no constitutional infirmity with law enforcement's actions here, it alternatively sees no basis to order suppression as a remedy on these facts. *See also, e.g.*, *United States v. Evers,* 669 F.3d 645, 654 (6th Cir. 2012) (holding the suppression was inappropriate where, as here, the affidavit was not so 'bare bones' or the warrant so 'facially deficient' that the executing officers could not have relied on them); *United States v. Garcia,* 496 F.3d 495, 507 (6th Cir. 2007) (distinguishing between the remedy for a general search (suppression of all evidence) and the unlawful seizure of particular items during an otherwise valid search (suppression of only the unlawfully seized evidence)).